Missouri Pacific Railroad Company *v.* Lemons.

4-5431                                                    127 S. W. 2d 120

Opinion delivered April 10, 1939.

*R. E. Wiley* and *E. W. Moorhead,* for appellant.
*Surrey E. Gilliam,* for appellee.

MEHAFFY, J.  This action was instituted by the appellee against the appellant in the Union circuit court to recover for damages alleged to have been caused by one of the trains of appellant striking the truck in which appellee was riding at a railroad crossing in El Dorado, Arkansas.

The appellee, W. O. Lemons, testified that he was injured in a crossing accident on May 18, 1936; he was 56 years old and had lived in El Dorado since 1925; had been employed by various oil companies and had farmed two years; did hard manual labor and was in good health; he had been injured once before, but had had no trouble working since that injury; before the depression he had made about $140 a month, but at the time of his injury he was making $36 a month; was working for the WPA and had gone in a truck with Frank Vines to return a borrowed water hose; rode in the front seat while Frank Vines drove the truck; he had never driven a truck of this kind and knew nothing about it; about 3:35 in the afternoon they came to the crossing and when they got within 50 or 60 feet of the railroad crossing Vines stopped the truck; appellee looked up and down the track both ways and listened; he could see a considerable distance both ways; did not see any train or hear any bell or whistle; it was upgrade to the tracks; as the truck got on the tracks it stalled and appellee looked toward the north and saw the train coming; Vines was trying to start the truck; witness tried to open the door, but could not, and the train hit the truck and knocked appellee out; the front wheels had just gone over the track when the truck stopped; when the train hit, the truck had been pushed forward a little; was nearly off the tracks; if the train had slowed up a little they would have gotten off; never heard the application of any brakes on the train and did not hear a bell or whistle; does not think the train slowed down at all; when witness

first saw the train it was 800 or 900 feet away; has been under the treatment of a doctor ever since the injury; was dazed at the time of the accident; had a gash over his eye and his arm was hurt, his side and leg, and the side of his head; suffered a lot of pain; has been in bed the biggest part of the time, unable to do any work; before he was injured he weighed 158 pounds and now weighs 135. Witness testified on cross-examination that the truck stopped about the center of the track; that after they started up the grade the truck stopped on the grade, but witness did not see the train coming; he could see down the track a long way; his eyesight was good at the time; he looked down the track and there was no train coming; he did not see the train while the truck was moving; he looked all the way up until he got on the track; the truck went dead on the track and Mr. Vines was trying to do something and witness looked back and saw the train; this was after the truck stopped.

Frank Vines testified to substantially the same things testified to by appellee. Witnesses then testified as to the extent of appellee's injury, and Glen Corn, conductor on the train, testified that he was riding in the coach and the first he knew about it was when the brakes went on; the train stopped and he found they had hit a truck; just before they hit the truck they were going ten or 15 miles an hour; the train could have been stopped in 175 yards; heard the bell but no whistle; the track is reasonably straight at the crossing; ordinarily brakes would take hold three or four seconds after they were applied.

T. T. Simmons the fireman on the train, testified that he remembered the collision, and that just before the collision he was on the seat box on the left side of the engine looking out, ringing the bell; saw the truck come off the pavement approaching the crossing when the train was about 150 feet from the crossing and the truck was about the same distance; the truck stopped about five feet from the tracks and he thought it was going to let them go by; the driver seemed to be changing shifts, or something, and then he attempted to cross and as far as wit-

ness could tell he went across, passed out of his sight; he hollered to the engineer that they were going to hit a truck and he applied the brakes; the train stopped just over the crossing; the truck stopped on the side on the incline and then proceeded on across. When witness first saw the truck, it was making about 25 miles an hour; the engineer was on the right side of the engine; the boiler cut him off from seeing a truck on the left; did not see the truck stop at the bottom of the incline; train was about 150 or 160 feet long; truck was going about 20 or 25 miles an hour; when it stopped it was about five feet from the track; when it came on to a dead stop the train was about 40 feet from the crossing; truck could have gotten across if it had kept going like it was when he saw it; it almost got across before it was struck; the engineer had reduced the speed back at the yard board and after reducing the speed the train was going about 25 miles an hour; the engineer would have had to put on emergency to stop the train between the time when witness first saw the truck and the time when they reached the crossing; did not put on the brakes when they first saw the truck 150 feet from the crossing.

The engineer testified that the first thing he saw was the front wheels of a truck moving slowly over the track and he was then within 25 or 30 feet of the crossing; that he cut off the steam and applied the brakes; he sounded no whistle; the bell was ringing; did not hear the fireman holler at him and if he had he could not have stopped the train; he could have slowed it down and the truck might have had time to go across.

W. E. Hickman, chief of police in El Dorado, testified that Vines told him he thought he was hit by a freight train.

The court gave a number of instructions at the request of each party. The jury returned a verdict against the Missouri Pacific Railroad Company and the trustee in favor of appellee for the sum of $3,000. The case is here on appeal.

It is not necessary to set out the instructions, as it is not contended that the jury were not properly instructed.

Appellant's first contention is that a verdict should have been directed for the appellant, and to sustain this contention appellant cites and relies on a number of cases.

The first case relied on is *Missouri Pacific Railroad Co. et al.* v. *Brewer,* 193 Ark. 754, 102 S. W. 2d 538. In that case there was a verdict for the defendant railway company, and the trial court granted a new trial. This court held that the new trial should not have been granted. The court said in that case: "The physical facts not only dispute plaintiff's testimony relating to the precaution he took before driving upon the crossing, but completely refute it. If he had used his sense of sight, or hearing, as he said he did, he was bound to have both heard and seen the approaching train. Certainly this is true if he had continued to look and listen during the time he was moving toward the crossing." The court also said: "It is inescapable, therefore, that plaintiff neither looked nor listened, but apparently concluded that as one car had crossed in safety, he could also, and was negligent." The court also said in that case: "Where there is a substantial conflict in the testimony this court will not interfere with the judgment of the trial court as to where lies the preponderance of the testimony."

The evidence in the Brewer case was wholly different from the evidence in the instant case. The appellee testified in this case that when they got within 50 or 60 feet of the crossing they stopped, looked and listened, and there was no train in sight and they heard no alarm, either bell or whistle, nor any noise of the train. Appellee testified that going up the grade he continued to look both ways to see if a train was coming and did not see any train. Appellee testified that the truck came to a stop when it got on top of the track; stopped dead. He also testified that after the truck had stopped he looked and saw the train coming. Vines, driver of the truck, had in the meantime got the truck started and it got very nearly across the track; so nearly across that the engine of the train struck the rear wheel of the truck. The testimony, also, showed that the appellee, while listening, heard no noise of the train and when it

came, he did not hear the brakes applied or anything to indicate that the brakes had been applied. He does not think the train slowed down any, and says that if it had, they could have gotten off the track. The evidence is ample to justify the jury in finding that both Vines and appellee were keeping a lookout for the train and the evidence shows that when the appellee saw the train coming, after the truck had stalled on the track, that the train was 800 or 900 feet away. If the jury believed this evidence, which they had a right to do, they were justified in finding that the train could have stopped or its speed checked in time to have avoided the collision after the engine men could have seen the truck.

Appellant calls attention to several other cases, but the law is so well settled in this state, it is unnecessary to discuss these cases. Appellant calls attention to the well established rule of this court that the engine-men of a train, while keeping a lookout, may assume that a person, before starting across the track, will exercise due care for his own safety, and ordinarily no duty rests upon the railroad employees to give an alarm until it reasonably appears that such person is entering or about to enter a place of danger; but if there is anything in the appearance or conduct of the person crossing the track to indicate to the trainmen that the person is entering a place of danger, or that he is in a perilous position and unaware of his danger, then it is the duty of the trainmen to take such precaution as is necessary to avoid injuring him. It is true, the engine men have a right to assume that persons about to cross the track will not be guilty of negligence unless there is something to indicate the contrary. Everyone has a right to assume that others will perform their duty when there are no facts indicating the contrary; but there is no presumption that a person will not go on the track when the facts indicate that he is going on it. On the other hand, the traveler has a right to assume that the trainmen will not be guilty of negligence and that they will perform the duties imposed upon the railroad company by law. They have a right to assume that there will be a bell rung or

whistle sounded before the train reaches the crossing, unless they know that it is not giving the alarms.

In this case the engineer did not see the truck, and it is undisputed that the speed of the train was not checked. But if appellee was guilty of negligence contributing to his injury, he would not be denied a recovery if there was substantial evidence to show that the statutory duty was not exercised by the railroad company; or if by keeping a proper lookout, appellee's peril could have been discovered in time to avoid the accident by exercise of reasonable care.

We think the jury was justified in finding that the appellee was not guilty of negligence, but if they should find that he was guilty of negligence, it would not bar his recovery.

There is no question of law involved in the case; that is, there is no dispute about the law, but it is purely a question of fact, and the only question is: Is there substantial evidence to support the verdict?

The appellant relies largely on the case of *Jamell* v. *St. L. S. W. Ry Co.*, 178 Ark. 578, 11 S. W. 2d 449. The court said in that case: "In the case at bar the fireman, who was keeping a lookout on the engine of the passenger train, testified that he saw the plaintiff drive up to the edge of the ties at the public crossing where the accident occurred, and then back down the grade again. He then supposed that the plaintiff would not attempt to run up the grade again until after the train had passed. The plaintiff admitted that he did not look for the approach of the passenger train, and admitted that he could have seen it if he had looked. The track was straight at that point, and the reason that the plaintiff did not see the approaching train was that he did not look. When he admits that he did not look, when, if he had looked, he could have stopped his car in time to have avoided the accident, he cannot recover because his own negligence directly contributed to the happening of the accident, and there was no negligence whatever on the part of the defendant, because the fireman was justified, under the circumstances, in believing that the defendant, when he backed

his car down the grade just before the accident would not ride up the grade again in front of a rapidly approaching train."

Section 11144 of Pope's Digest reads as follows: "It shall be the duty of all persons running trains in this state upon any railroad to keep a constant lookout for persons and property upon the track of any and all railroads, and if any person or property shall be killed or injured by the neglect of any employee of any railroad to keep such lookout, the company owning or operating any such railroad shall be liable and responsible to the person injured for all damages resulting from neglect to keep such lookout, notwithstanding the contributory negligence of the person injured, where, if such lookout had been kept, the employee or employees in charge of such train of such company could have discovered the peril of the person injured in time to have prevented the injury by the exercise of reasonable care after the discovery of such peril, and the burden of proof shall devolve upon such railroad to establish the fact that this duty to keep such lookout has been performed."

In this case the question as to whether the appellant was guilty of negligence and as to whether the appellee was guilty of contributory negligence were questions of fact for the jury. The jury is the judge of the credibility of the witnesses and the weight of their testimony, and where there is substantial evidence to sustain its finding, it is conclusive. There was substantial evidence in this case to support the verdict, and the judgment is therefore affirmed.